## Commonwealth v. Bracey

*Sarah Vandanbraak, assistant district attorney,* for the Commonwealth.

*William Perrone,* for defendant.

*Robert B. Dunham,* for intervener.

*Brian McMonagle,* for Boyle family.

BIUNNO, *J.,* March 27, 1992—This matter is before this court for consideration of a motion brought by Group W Radio Inc. for intervention and access to judicial records. For the purposes of deciding this motion, this court recognizes and grants standing to Group W Radio Inc., the Commonwealth of Pennsylvania in the person of the district attorney of Philadelphia and her representatives and to Edward Bracey. Standing is also granted to Mr. and Mrs. Patrick Boyle, on their own behalf and on behalf of their murdered son, Police Officer Daniel Boyle.

## FACTUAL HISTORY

While making a car stop in February of 1991 in the city of Philadelphia, Police Officer Daniel Boyle was shot and killed by Edward Bracey. Testimony adduced at trial showed that Bracey had fired at least eight rounds from a 9mm pistol at Officer Boyle, of which one round fatally struck Officer Boyle in the head.

As part of its case-in-chief, the district attorney played for the jury a tape of radio transmissions between police radio control and various patrol units, including Officer

Boyle's unit. The tape purportedly contained the actual shots fired at Officer Boyle, Boyle's plaintive cries for help and radio control's efforts to send assistance.[1] Bracey was ultimately convicted of murder in the first degree[2] and related offenses. The jury set the penalty at death.

At the time the tape was played, the district attorney marked for identification and later admitted into evidence the written transcript of the audio tape. The tape itself was not marked nor admitted formally into evidence. Group W did obtain a copy of the transcript on the day that it was played for the jury and one of their reporters was present during the trial proceedings. The contents of the tape were reported by Group W as part of its trial coverage.

The instant motion arises from the Commonwealth's denial of access to and opportunity of Group W to copy the audio tape. The motion was filed two weeks after the tape was played to the jury and two days after sentence of death was imposed on Edward Bracey.

## DISCUSSION

Without question, there is strong common-law presumption of access and right of the public to inspect and copy judicial records. *Richmond Newspapers Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), *Nixon v. Warner Communications*, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978); *United States v. Criden (Criden I)*, 648 F.2d 814 (3rd Cir. 1981); *Common-*

---

1. This court was unable to discern the gunshots from background static, despite listening to the tape several times.

2. 18 Pa.C.S. §2502(a).

*wealth v. Fenstermaker*, 515 Pa. 501, 530 A.2d 414 (1987).

The court cannot discount the importance to the public of having the opportunity to observe and comment on the functioning of the criminal justice system. In general, such public access serves to promote trustworthiness of judicial proceedings, to curb judicial abuse and to provide the public with a more complete understanding of the judicial system. *Littlejohn v. BIC Corp.*, 851 F.2d 673 (3 Cir. 1988).

In the instant matter, the denial of access is a very narrow one; the denial of access to and right to copy an audio tape played during the course of the trial. There is no dispute that Group W had access to and was admitted into the courtroom during the trial. Nor is there any dispute as to the intervener's access to and receipt of the written transcript of the tape. The events of the trial including the contents of the tape were reported by Group W and other media representatives almost daily. Group W contends that the common law right to access has been violated by their inability to copy the audio tape in question.

At the outset, this court must determine whether the tapes sought are, in fact, public judicial documents. We are not convinced by the Commonwealth that the tape is not a "public document" because it was not admitted into evidence.

The tape was played for the jury in open court and for all the public to hear. There was and is no attempt by the Commonwealth or this court to prevent the dissemination of the contents of the tape. The fact that the tape was made public, in a courtroom during a criminal

proceeding, causes it to become a "public judicial document."[3] See *Commonwealth v. Fenstermaker, supra; Commonwealth v. Genovese*, 337 Pa. Super. 485, 487 A.2d 364 (1985).

Although the tape in question may be considered a "public judicial document," the right to access invoked by Group W is not absolute. *Globe Newspaper Co. v. Superior Court for County of Norfolk*, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982). *United States v. Criden (Criden I)*, 648 F.2d 814 (3rd Cir. 1981); *Commonwealth v. Fenstermaker*, 515 Pa. 501, 530 A.2d 414 (1987).

The decision to release the tape in question is soundly within the discretion of this court. *Criden I, supra.* Courts have supervisory power over their records and files.[4] *Nixon v. Warner Communications, supra; Commonwealth v. Fenstermaker, supra.*

In exercising their supervisory powers and exercising their discretion to grant or deny access, the courts are to determine whether the presumption of openness at-

---

3. The Commonwealth argues that since the tape itself was not admitted, formally, into evidence, it is not part of the public record. We do not agree. The right of public access to documents is not determined by whether evidence was properly admitted. *Littlejohn, supra.* See also, *U.S. v. Martin*, 746 F.2d 964 (1984) (transcripts of tapes not admitted into evidence but provided to jury are judicial records.)

4. The Commonwealth argues that this court no longer has supervision of the tape since it has been returned to its possession and looks to *Littlejohn* as authority. The instant matter is factually distinguishable from *Littlejohn* in that the case had settled 10 months prior to request for documents. Instantly, the *Bracey* case is on appeal and the tape-playing is being challenged, therefore the tape is still under control of the courts.

tached to a public document is outweighed by circumstances warranting closure of the document to public inspection or copying. *Fenstermaker* at 513, 530 A.2d 420.

Circumstances which have led to the closure of a court or denial of access to documents have included trials involving minor victims of sex crimes (*Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982)), protection of privacy interests of prospective jurors (*Press Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984)) and where closure is necessary to prevent impermissible injury to third parties. *U.S. v. Criden (Criden I)*, 648 F.2d 814 (1981) and *United States v. Criden (Criden III)*, 681 F.2d 922 (1982).

These circumstances which support the rebuttal of the presumption of public access do not allow for a broad denial or closure of documents. Any denial of access should be narrowly tailored to protect the interests involved. *Press Enterprise, supra; Globe Newspaper, supra.*[5]

With the foregoing discussion in mind we turn to the motion before this court.[6]

---

·5. Although this court recognizes something of a fine line distinction between the strong presumption of the common law right of access and the First Amendment right of access, we do not believe that such distinctions are necessary in the determination of this motion. Public access has been denied under both rights for the circumstances noted above or at the very least the possibility of denial has been acknowledged by federal and state courts under specific circumstances.

6. On behalf of Edward Bracey, the argument has been made that his Sixth Amendment rights would be jeopardized by the release

Group W in support of its right to access to the audio tape claims that the underlying case is of "overwhelming public concern (based on) the imposition of the death penalty." "It involves activities with a police officer, who are public officials who face grave danger of which the public should be aware."

It argues that the public has a right to be informed about the dangers the police officers face and that the tape "produces a more instinctive reaction than a transcript does." Group W also avers that access to the audio tape will provide the public with a better understanding of judicial proceedings and the kind of evidence that can be admitted or introduced in a criminal trial.

The Commonwealth, arguing against access, claims essentially that the government has a compelling interest in protecting the individual privacy rights of Officer Boyle and his parents as victims of the crime. The harm to the Boyles which will be caused by the broadcasting of this audio tape, "two, three, four times a day" must outweigh Group W's right to access.

The Boyles, through counsel, also challenge the release of the tape on privacy grounds. Their grief, sorrow and pain on the loss of a son will be greatly intensified and compounded should the motion be granted. The fact that Daniel was murdered and his dying cries for help cannot be answered by them increases the intolerable and

---

of the tape as it would prejudice the community against him and deny him an impartial jury and fair trial in another unrelated homicide proceeding soon to be tried or should a new trial be granted in the instant case. This court believes that Bracey's Sixth Amendment rights can be adequately protected through a thorough voir dire proceeding, sequestration of jurors or a change in venue. As such, we will not consider or discuss this argument any further.

unbearable emotions they already experience. They claim that Group W's interest in the tape is based on pure sensationalism hiding behind the rubric of public interest.

In *United States v. Criden,* the 3rd Circuit Court of Appeals held that the presumption of access may be overcome where the rebroadcast of evidence may inflict unnecessary and intentional pain on the parties who the court reasonably finds are entitled to such protection. 648 F.2d at 829. We are persuaded that denial of the instant motion is proper under the circumstances before this court.

Group W has received a transcript of the audio tape in question. It reported in its newscasts the contents of the tape and its reporter was in the courtroom while the tape was played. The request for the audio tape coming two weeks after it was played at the trial and two days after the killer was sentenced gives emphasis to the perception that petitioner is not seeking to disseminate timely information but rather to enliven its broadcasts by sensationalizing the death of a police officer through his own dying cries for help.

If the last cries and utterances of dying astronauts are entitled to the respect of privacy to shield loved ones from needless pain, the death of a rookie police officer is entitled to no less. See *New York Times Co. v. National Aeronautics and Space Administration,* 920 F.2d 1002 (D.C. Cir. 1990).

This court presided over the trial of Edward Bracey. It was able to observe firsthand the devastating effects that the death of Daniel Boyle has had on his family. Patrick Boyle, Daniel's father, was barely able to compose himself to testify at trial and during the penalty phase of the case. Daniel's sister, Kathleen, also was visibly

distraught during her testimony. Patrick and Kathleen both testified that the pain of losing Daniel has been overwhelming and physically debilitating.

To permit the rebroadcast of the audio tape would obviously intensify the pain unnecessarily and to no public purpose.

Group W expresses its regret of the potential pain a rebroadcast will cause the Boyle family but argues that the public has a right to be informed of the grave dangers faced by police officers and to that end the tape "produces a more instinctive reaction than a transcript (of the radio transmissions) does." In other words, the public is better served when it can actually hear the officer's dying words and cries for help than by having them read from a transcript. Such an argument is specious and an attempt to rationalize sensationalism in the media.

The rebroadcast of this audio tape will not serve the public interest and would intrude severely upon the sensitive privacy rights of the victims. This court will not and cannot lend its support to such broadcast sensationalism. Since Group W has had other access to the material in question, we are merely limiting access to the sound itself. This narrow closure of judicial records is in no way impeding the publication of the contents of the tape.

Nor do we accept Group W's argument that any greater educational or informational benefit would inure to the public by the rebroadcast of the tape. The form and quality of evidence admitted in the course of a criminal proceeding is adequately and constitutionally determined by the access already provided to the petitioner. The rebroadcast of the tape will not, in and of itself, raise any significant issues of public interest not raised already

in this case.[7] Group W has been provided with a transcript of the tape and we do not understand how the public's interest can be better served by allowing them access to the tape.

We find as a matter of law that the privacy interests of the Boyle family to be free from unnecessary and intentional infliction of pain outweigh the petitioner's rights of access to the tape. We further find as a matter of law that the Commonwealth has a compelling interest in the protection and privacy interests of its crime victims which overrides the petitioner's rights of access.

The intervenor's petition for access to the audio tape of the radio transmissions is denied.

---

7. Any analogy of the instant motion with those cases relating to access to videotapes is inappropriate. The adage that "one picture is worth a thousand words" simply does not apply to an audio medium and an audio media. The transcript of the tape provides Group W with an accurate account of the words spoken so that they do not have to rely on an incomprehensible tape.