March 24, 1993 UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1115
No. 92-1116
RICHARD AND ANITA POLIQUIN,

Plaintiffs-Appellants,

v.

GARDEN WAY, INC.,

Defendant-Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, U.S. District Judge]

Before

Torruella and Boudin, Circuit Judges,

and Keeton,* District Judge.

Maurice A. Libner with whom Marcia J. Cleveland and McTeague,

Higbee, Libner, MacAdam, Case and Watson were on brief for appellants.

Cheryl Flax-Davidson and Bob Gibbins were on brief for The

Association of Trial Lawyers of America, amicus curiae.
Mark L. Austrian with whom Collier, Shannon, Rill & Scott, Roy E.

Thompson, Jr., Glenn H. Robinson, and Thompson & Bowie were on brief

for appellee.
James D. Poliquin, Russell B. Pierce, Jr. and Norman, Hanson &

DeTroy were on brief for The Defense Research Institute, Inc., amicus

curiae.

March 24, 1993

*Of the District of Massachusetts, sitting by designation.

BOUDIN, Circuit Judge. Richard and Anita Poliquin,

appellants in this court and plaintiffs below, challenge

protective orders of the district court limiting access to

certain discovery materials in this case. The plaintiffs'

underlying product liability claim has been settled. The

discovery dispute lives on, consuming the time and energy of

the courts, largely as a contest between plaintiffs' counsel

and the defendant-appellee, Garden Way, Inc. For reasons set

forth below, we modify the orders under review in one

important respect and otherwise affirm.

I. PROCEEDINGS IN THE DISTRICT COURT

In October 1990, Richard Poliquin was seriously injured

while operating the Super Tomahawk, a chipper/shredder

manufactured by Garden Way. He and his wife brought suit

against Garden Way in the district court, charging that the

injury was due to the defective design of the product. The

Poliquins sought discovery from Garden Way including design

specifications, sales data and information about other

accidents involving the Super Tomahawk or similar equipment.

In response, Garden Way sought a protective order

limiting disclosure of answers and documents produced in

response to specified discovery requests. The Poliquins

resisted. Garden Way submitted an affidavit from its general

counsel Lucia Miller in support of its request. On August

2, 1991, after a hearing on discovery issues, a protective

-2-

order was entered by the magistrate judge to whom discover

matters had been assigned. The protective order said that

Garden Way did have "valuable trade secrets and other

confidential information" which were sought in discovery but

should not be made public. The order afforded confidential

treatment to information obtained through some, but not all,

of the interrogatories specified by Garden Way, and to other

information that had been the subject of the hearing.

The August 2 order also created a mechanism for

resolving disputes about new discovery. It provided that if

Garden Way produced other information or documents that it

deemed confidential, it should mark them with a legend

showing that they were "confidential" pursuant to court order

in the case. If the Poliquins disagreed, they could contest

the designation by motion within a fixed period, effectively

15 days from the production of the materials. The order

provided that it "shall not terminate at the conclusion of

this action" and within 90 days after the conclusion, all

information and documents subject to the order "shall be

destroyed" and a certificate of destruction provided by

counsel.

The Poliquins appealed the August 2 order to the

district judge who affirmed it as "not clearly erroneous."

An appeal to this court was taken but dismissed as

interlocutory. The interrogatory answers and documents

-3-

provided by Garden Way under the protective order listed the

names of other persons who had been injured by Garden Way

equipment and included a number of complaints such persons

had filed in other suits. The Poliquins later took

depositions (under Fed. R. Civ. P. 31) of 23 other

individuals who had suffered such accidents, as well as the

videotaped deposition of Jay Sluiter, a former employee of

Garden Way. The protective order provided that confidential

information within a deposition transcript was to be

designated by underlining the lines in question and stamping

the pages "confidential." It is not clear that Garden Way

did so in each instance.

A pretrial hearing occurred on October 24, 1991. The

district judge ruled that the Poliquins were free to offer

information and documents at trial even if they had been

designated as confidential during discovery. During this

colloquy, plaintiffs' counsel suggested that material offered

in evidence would be freed from further restriction, so he

could send such material to other plaintiffs who had similar

cases. Defense counsel disagreed and concluded by saying

that when trial is over "I will request that those exhibits

be returned." The court replied: "Correct. . . . When the

trial is over, whatever rights you have . . . to control the

further dissemination of the material, you can invoke."

-4-

Trial began on October 28, 1991. During trial, the

court permitted the Poliquins' counsel to read to the jury a

portion of Garden Way's interrogatory answers--relating to

certain of the other accidents involving Garden Way

equipment--but it did not allow the written interrogatory

answers themselves to be offered as exhibits and excluded

information about many of the other accidents altogether.

None of the Rule 31 depositions of other injured persons was

admitted or read to the jury, the court excluding them as

prejudicial and of little value. A videotape of the Sluiter

deposition was shown to the jury in its entirety.

During trial, the parties agreed to settle the case, and

the jury was discharged. Thereafter, on November 13, 1991,

defense counsel wrote to the Poliquins' counsel listing 214

items claimed to be covered by the protective order, and

requesting that the listed material be returned or destroyed.

Some of the 214 items had not previously been designated as

confidential. Included in the list were portions of the

trial record. It appears that the Poliquins' counsel did not

immediately reply.

On November 18, 1991, plaintiffs executed a "release and

indemnity agreement" and received a check. The agreement

stated that "[r]eleasors and their attorney acknowledge that

they are still bound by the terms of the [August 2]

Protective Order" as to disclosure of protected materials.

-5-

In a signed addendum, the Poliquins' counsel approved the

agreement and "acknowledge[d] continuing applicability of the

Protective Order and agree[d] to comply with the portions of

this agreement which apply to him." The counsel "further

agree[d]" that he would instruct any expert or consultant

shown confidential material not to disseminate it and to

return all documents or other written materials to defense

counsel. On November 27, 1991, the district court formally

dismissed the case.

Shortly before the dismissal, the Poliquins on

November 25, 1991, filed a motion "for determination of

confidentiality" asking the court to rule that a number of

items listed in the November 13, 1991, letter were not

subject to any confidentiality restriction. The Poliquins

argued that their counsel had independently learned the names

of seven injury victims before the interrogatories were

answered; that any information admitted into evidence at

trial, (e.g., the Sluiter deposition) should not be

protected; that it would be wasteful of resources to protect

the unadmitted Rule 31 depositions of victims; and that court

complaints filed in other cases, although furnished by Garden

Way in discovery and not admitted at trial, were public

documents.

Garden Way opposed the motion and asked the court to

seal pendente lite confidential material to the extent

-6-

contained in the court's file. By endorsements, the district

judge on December 10, 1991, granted Garden Way's request and

denied the Poliquins' motion. Then, on January 17, 1992, the

district court on further review of Garden Way's request

directed that material subject to the August 2 protective

order be removed from the court file by counsel for Garden

Way and the court then sealed "all testimony and arguments

made during the trial dealing with the matters which are

subject to" the August 2 order, unless and until otherwise

ordered by the court.

The Poliquins appealed to this court both the December

10, 1991, order denying its motion and the January 17, 1992,

order sealing in part the trial record. An amicus brief

supporting them has been filed by the Association of Trial

Lawyers of America and another in opposition by the Defense

Research Institute, Inc. There is no hint that the Poliquins

themselves have any practical interest in the outcome of the

appeal, but as they are formally subject to protective orders

entered in their case, we see no lack of standing to seek

appellate review.

II. THRESHOLD ISSUES

At the outset, we face arguments on both sides that

important issues have been waived or relinquished. To raise

an issue on appeal, a litigant must generally show the issue

was raised in the trial court by a proper request or

-7-

objection and that the right ground for the request or

objection was given at the time. See generally Clauson v.

Smith, 823 F.2d 660, 666 (1st Cir. 1987) (collecting waiver

cases). Even then, a mistake in the ruling will be

disregarded unless prejudice resulted from the error. E.g.,

Fed. R. Evid. 103(a). Finally, nothing prevents a party from

consenting by stipulation or contract not to pursue a

specific issue on appellate review.

The reason for the rules is not that litigation is a

game, like golf, with arbitrary rules to test the skill of

the players. Rather, litigation is a "winnowing process,"

Howell v. Federal Deposit Ins. Corp., No. 92-1542, slip op.

at 15 (1st Cir. Feb. 17, 1993), and the procedures for

preserving or waiving issues are part of the machinery by

which courts narrow what remains to be decided. If lawyers

could pursue on appeal issues not properly raised below,

there would be little incentive to get it right the first

time and no end of retrials. Thus, while there are escape

hatches--"plain error," "miscarriage of justice," and other

rubrics--an argument not properly preserved in the trial

court is normally unavailable on appeal.

Garden Way argues that in the release the Poliquins

agreed to be "bound" by the August 2 protective order, and so

have relinquished their right to challenge the protective

order on appeal. The argument may have more force as to some

-8-

of the information in dispute (e.g., the answers to

specifically protected interrogatories) and less as to other

items (anything arguably "added" by Garden Way's post-trial

letter to previously protected information). But we need not

resolve the matter because Garden Way made no such

relinquishment argument to the district court when it opposed

the Poliquins' motion to determine confidentiality.

Although appellate courts have discretion to resolve

issues waived or abandoned at trial, Clauson, 823 F.2d at

666, this is and should be uncommon, especially where facts

pertinent to the issue are not in the record. Here, the

import of the release is less clear than Garden Way suggests.

The release states that the Poliquins are "still bound by the

terms" of the August 2 protective order, but it is open to

argument whether "the terms" apply to all of the disputed

material. The parties' intentions might be illuminated by

facts incident to the negotiations, but those facts are

absent. In all events, we conclude that Garden Way has

itself waived the right to argue that the release bars this

appeal.

Garden Way next argues that the Poliquins cannot attack

the protective order because they failed to file an affidavit

of their own in opposition to the original request for that

order. We think it plain that the Poliquins, having made and

pursued a timely objection to the August 2 order, are free

-9-

to argue that the order was itself unlawful ab initio. The

burden of showing cause for the order was upon Garden Way and

the Poliquins can argue that the burden was not met (or that

the order was overbroad) without offering affidavits of their

own.

Finally, turning the tables, the Poliquins themselves

contend that Garden Way lost the protection of the August 2

order as to various depositions because they were not marked

"confidential" and underlined as required by the order.

Garden Way says in reply that some depositions were not

received until the midst of trial, delaying the designation

process. The facts are obscure but need not be determined.

The Poliquins' waiver argument was not made in their motion

for a determination of confidentiality or the supporting

memorandum. Accordingly, this fact-bound argument is itself

unavailable on appeal.

III. THE MERITS

The August 2 Order. Protective orders of various kinds

are employed in civil cases, ranging from true blanket orders

(everything is tentatively protected until otherwise ordered)

to very narrow ones limiting access only to specific

information after a specific finding of need. See generally

Francis H. Hare, Jr., James L. Gilbert & William H. ReMine,

Confidentiality Orders, 4.10 (1988). The magistrate

judge's order in this case fell between these poles: it was

-10-

based on an affidavit cast in broad terms; it protected

specific interrogatory answers; and it set up a mechanism

allowing Garden Way to designate further confidential

material subject to objection by the Poliquins.

District judges need wide latitude in designing

protective orders, and the Federal Rules of Civil Procedure

reflect that approach. Rule 26(c) generously permits "for

good cause shown" the making of "any order which justice

requires" to protect against annoyance, embarrassment or

undue burden occasioned by discovery. The district court has

"broad discretion" to decide "when a protective order is

appropriate and what degree of protection is required,"

Seattle Times Co. v. Rhinehart, 467 U.S. 20, 36 (1984), and

great deference is shown to the district judge in framing and

administering such orders. Public Citizen v. Liggett Group,

Inc., 858 F.2d 775, 790 (1st Cir. 1988), cert. denied, 488

U.S. 1030 (1989); 8 Charles A. Wright & Arthur R. Miller,

Federal Practice and Procedure 2036 (1970).

Here, we have no doubt that the magistrate judge was

entitled to enter the August 2 order. Some trial judges take

a stricter view of the showing needed to protect discovery.

But, in coping with the torrent of material often discovered

but never used at trial, other judges require some general

showing by affidavit and then protect materials designated by

one side, subject to challenge by the other. Apart from a

-11-

few aspersions on the Garden Way affidavit, the Poliquins do

not seriously renew their prior attack on the original August

2 order. To the extent they do so, we reject that claim,

finding the Miller affidavit adequate to support the original

protective order.

This conclusion, however, does not even begin to dispose

of the case. The Poliquins' main attack is directed not to

the August 2 order of the magistrate judge but to the

protection afforded or reaffirmed under the district judge's

own ancillary orders of December 10, 1990, and January 17,

1991. These orders rejected the Poliquins' request to

release (1) the Sluiter deposition and certain excerpts from

interrogatory answers (read into evidence at trial) relating

to other accidents, (2) court complaints filed by certain

victims (which were not admitted at trial), and (3) and the

Rule 31 depositions of victims (which likewise were not

admitted at trial).1

Admitted Evidence. Among the items protected by the

district court's orders are materials that were actually

1These latter orders were issued after the dismissal of
the case, and under Public Citizen, 858 F.2d at 781-82, the

district court could not after dismissal expand the
protective order to create new obligations. Examining this
"juris-dictional" issue sua sponte, we find that the orders

in question represent in part a declaration of the scope of
the existing August 2 order as applied to disputed materials
and in part a refusal to remove prior protection. Thus, the
orders were within the district court's continuing authority
over previously issued orders.

-12-

admitted into evidence at trial: the videotape of the Sluiter

deposition and excerpts read into the record from

interrogatory answers describing other accidents. There is

no issue of waiver here, for (as earlier noted) Garden Way

made clear its desire to enforce the protective order even

for material admitted at trial, and the district court

reserved decision on the matter. We conclude, however, that

only the most compelling showing can justify post-trial

restriction on disclosure of testimony or documents actually

introduced at trial. That showing has not been made in this

case.

We have no doubt that, in rare circumstances, material

introduced at trial can be safeguarded against disclosure

afterwards. See Anderson v. Cryovac, Inc., 805 F.2d 1, 11-12

(1st Cir. 1986). Material of many different kinds may enter

the trial record in various ways and be considered by the

judge or jury for various purposes. The subject could be

national security, the formula for Coca Cola, or embarrassing

details of private life. The evidence might be offered only

at the bench and the transcript immediately sealed, or it

might be provided in a closed hearing, or it might be offered

in public but be hard to replicate without a transcript. It

is neither wise nor needful for this court to fashion a rule-

book to govern the range of possibilities.

-13-

One generalization, however, is safe: the ordinary

showing of good cause which is adequate to protect discovery

material from disclosure cannot alone justify protecting such

material after it has been introduced at trial. This

dividing line may in some measure be an arbitrary one, but it

accords with long-settled practice in this country separating

the presumptively private phase of litigation from the

presumptively public. See Cowley v. Pulsifer, 137 Mass. 392

(1884) (Holmes, J.). Open trials protect not only the rights

of individuals, but also the confidence of the public that

justice is being done by its courts in all matters, civil as

well as criminal. See Seattle Times Co., 467 U.S. at 33

(distinguishing discovery material, traditionally not

available to the public, from trial evidence which normally

is available).

There is thus an abiding presumption of access to trial

records and ample reason to "distinguish materials submitted

into evidence from the raw fruits of discovery." Littlejohn

v. BIC Corp., 851 F.2d 673, 678, 684 & n.28 (3d Cir. 1988).

As we have said elsewhere, "`[o]nly the most compelling

reasons can justify the non-disclosure of judicial records.'"

FTC v. Standard Financial Management Corp., 830 F.2d 404, 410

(1st Cir. 1987) (quoting In re Knoxville News-Sentinal Co.,

723 F.2d 470, 476 (6th Cir. 1983)). Accord, Joy v. North,

692 F.2d 880, 893-94 (2d Cir. 1982). In this case, there are

-14-

no separate findings by the district court explaining the

need for post-trial protection of trial evidence. While in

some cases "compelling reasons" might be apparent from the

record, that is not so here.

Considering first the description of other accidents in

the interrogatory responses, we believe no basis exists for a

finding of "compelling reasons." Garden Way's reason for

protection of such incidents is set forth in the Miller

affidavit. It amounts to a garden-variety claim that the

company's image among customers will be damaged through the

misuse or distortion of those accident claims. In our view,

this threat may be adequate as a ground for protecting

discovery material;2 but it is outweighed, after the

material is introduced in evidence, by the public's interest

in access to trial records. See Littlejohn, 851 F.2d at 685.

Trials after all commonly generate bad publicity for

defendants. Specific pieces of evidence are only details of

a larger picture, often a very disparaging one, created by

reports of the case in the press. This publicity may be

unfair or distorted, but the injury is the price paid for

open trials. At least in the absence of extraordinary

2Some courts have questioned whether corporate
reputation warrants protection at all under Rule 26, e.g.,

Smith v. BIC Corp., 869 F.2d 194 (3d Cir. 1989). In our

view, so long as the protective order permits the opposing
litigant to reach the material--and use it as needed at
trial--it is hard to see why the district court should not be
allowed to safeguard reputation.

-15-

circumstances, commercial embarrassment is not a "compelling

reason" to seal a trial record. We have examined the

interrogatory answer excerpts at issue in this case and find

nothing to alter our judgment.

The videotape of the Sluiter deposition presents a

different problem because Garden Way, in arguing about its

confidentiality, made a proffer which goes somewhat beyond

claims of embarrassment. Garden Way said that the deposition

deal[s] with the internal procedures by
which Garden Way evaluates a product,
market tests products and ultimately
purchases the product for incorporation
into its product line. [Sluiter's]
testimony and exhibits deal with Garden
Way's specific business plan for
shredders, business plans for other types
of power equipment, as well as customer
profile information. All this
information is highly confidential and
proprietary . . . .

Needless to say, these assertions, no matter how accurate,

could not provide a basis for protecting the entire videotape

of the deposition after its introduction into evidence, but

at most only trade secret or like material of unusual

importance.

In any event, we see no need for a remand to consider

any splicing of the tape. After reviewing the deposition

transcript, this court finds that the videotape contains

nothing remotely comparable to, say, the formula for Coca

Cola or even an important trade secret. Garden Way's

business methods are discussed but there are no startling

-16-

revelations. The disadvantages of disclosure relate to

future litigation, not the conduct of Garden Way's business.

There is no "compelling reason" here to restrict access to a

videotape already played in open court.

We note that a litigant like Garden Way has a

straightforward trial remedy, one apparently not used in this

case. At the time that confidential information is offered

in evidence, the trial judge has ample power to exclude those

portions that have limited relevance but contain trade

secrets or other highly sensitive information. Fed. R. Evid.

403. This approach will not solve every problem but, to the

extent it applies, it can mitigate harm without any

impairment of public access to the trial record.

Public Records. The Poliquins next object to the

protection after trial of copies of civil complaints filed in

other courts against Garden Way by other accident victims in

other cases. None of these complaints was accepted in

evidence at trial. Nor do we understand the Poliquins to

claim that their attorney obtained the complaints

independently of discovery.3 The issue, then, is whether

3Their attorney asserts that he obtained the names of
seven victims independently but then secured the complaints
they had filed from Garden Way through compulsory discovery.
In our view this makes the complaints themselves discovered
material. Limiting use of independently obtained material
would, of course, raise serious questions as to the scope of
the court's authority and under the First Amendment. See

Seattle Times, 467 U.S. at 37; International Products Corp.

v. Koons, 325 F.2d 403, 409 (2d Cir. 1963) (Friendly, J.).

-17-

the character of the complaints as public records means that

"good cause" cannot exist for protecting them under Rule 26

even though they were obtained by compulsory discovery from

the party seeking protection.

At first blush, it might appear odd to safeguard with a

protective order "public" documents that anyone in the

country can secure by visiting a government office and using

the copying machine. Yet, one can easily imagine "public"

archival material where difficulties of discovery and

assembly represent a significant investment by the original

finder and a barrier to easy replication. Indeed, most

"trade secrets" are duplicable with enough time and effort.

The futility of protecting a "public" document might persuade

a court to deny protection. But we see no basis for a

blanket rule forbidding Rule 26 protection in all instances

where the "public" document is obtained through discovery

under an otherwise justified protective order.

The "public" character of the complaints is the only

reason given by the Poliquins for ordering their disclosure.

We therefore have no reason to consider whether the

magistrate judge's original inclusion of the complaints under

the protective order was error for any other reasons. A

protective order may often specify categories of information

for protection without document by document review, and the

-18-

design of the order is in any event largely within the trial

court's discretion.

The Rule 31 Depositions. The remaining documents in

dispute are the Rule 31 depositions of 23 accident victims

not admitted into evidence at trial. The issue before us is

narrow. The Poliquins, as we have said, have waived any

claim that protection for the depositions was not timely

sought. Nor do the Poliquins assert that the depositions

must be disclosed in order to advise the public, and

especially the authorities, of an unknown danger. Cf.

Anderson v. Cryovac, Inc., 805 F.2d at 8 (permitting

plaintiffs to disclose to government authorities discovery

information regarding toxic chemicals in the city's water

supply). In this case, nothing prevents the Poliquins from

advising the government of their claim that the Super

Tomahawk is defective.

The Poliquins argue instead that disclosure of the

depositions is warranted to avoid wasteful duplication of

discovery in other cases.4 The argument has a surface

appeal in a time of swollen litigation cost and crowded

dockets, but it looks at only one element in the equation.

4The Poliquins' counsel also argues that he has invested
$5,000 in taking the depositions and should be free to recoup
his costs by using the depositions in other suits against
Garden Way. This version of events overlooks the fact that
counsel was not doing private research but was using the
court's compulsory process to secure the information from
deponents compelled to attend and answer.

-19-

Absent an immediate threat to public health or safety, the

first concern of the court is with the resolution of the case

at hand. Judges have found in many cases that effective

discovery, with a minimum of disputes, is achieved by

affording relatively generous protection to discovery

material. Impairing this process has immediate costs,

including the delay of discovery and the cost to the parties

and the court of resolving objections that would not be made

if a protective order were allowed.

For these reasons, the district court under current law

retains broad discretion to protect discovery material,

despite the burden of re-discovery imposed on future

litigants in future cases. There have been proposals in

Congress for "sunshine" legislation to provide public access

to discovery, Court Secrecy: Hearings Before the Subcomm. on

Courts and Administrative Procedure of the Senate Judiciary

Committee, 100th Cong., 1st Sess. (1990), but there has also

been strong opposition to these proposals and few states have

adopted them. See, e.g., Judicial Conf. of the United

States, Report of the Federal Courts Study Committee 102-03

(1990); Arthur Miller, Confidentiality, Protective Orders,

and Public Access to the Courts, 105 Harv. L. Rev. 427, 477-

502 (1991). In all events, Congress has not altered the law.

Where the district court does protect material during

discovery, it is common to provide, as the magistrate judge

-20-

did here, for post-trial protection including the return or

destruction of protected material. In most cases, the

lubricating effects of the protective order on pre-trial

discovery would be lost if the order expired at the end of

the case or were subject to ready alteration. See Miller,

supra, at 499-500. Nevertheless, a protective order, like

any ongoing injunction, is always subject to the inherent

power of the district court to relax or terminate the order,

even after judgment. Public Citizen, 858 F.2d at 781-82.

This retained power in the court to alter its own

ongoing directives provides a safety valve for public

interest concerns, changed circumstances or any other basis

that may reasonably be offered for later adjustment. Where

such a request is made to the district judge and an appeal

thereafter follows, the standard of review broadly speaking

is abuse of discretion. Id. at 790-92. Nothing in this case

suggests that the district court abused its discretion in

refusing to lift the protective order for discovery materials

not introduced at trial.

The orders of the district court under review are

modified to exclude from their scope the videotape of the

Sluiter deposition and the interrogatory answer excerpts to

the extent read into evidence, and the district court's

orders are otherwise affirmed. No costs.

-21-

KEETON, District Judge (Dissenting). I

respectfully dissent on the ground that this court is without

jurisdiction to hear this appeal, and, in the alternative,

that the most we have jurisdiction to do, and should do, is

to vacate aspects of the district court orders that were

beyond the district court's jurisdiction.

I. Jurisdiction Over the Appeal

The briefs filed in this case by counsel for the

named parties present issues of fundamental significance

concerning the nature and scope of protective orders issued

by district courts during pretrial proceedings and concerning

settlements on terms that leave such orders in effect.

Amicus briefs (filed on behalf of separate associations of

attorneys who commonly represent plaintiffs and defendants

respectively in product liability actions) reflect widespread

interest in the bar.

The importance of the issues underscores the

importance of this court's sensitivity to limits on its

jurisdiction. I recognize how pressing are the interests of

the bar and trial judges in having clear guidance about

important unsettled issues that are confronted almost daily

in the district courts. At least equally compelling,

however, are the interests underlying limits on our

jurisdictional authority. We must respect constitutional

constraints against issuing advisory opinions when no live

-22-

case or controversy is presented to the court by real parties

in interest.

A. Interest of the Poliquins

As noted in Part I of the Court's Opinion, the

Poliquins, nominally the appellants in this case, received a

check from Garden Way and executed a "release and indemnity

agreement" that included a provision declaring that

"[r]eleasors and their attorney acknowledge that they are

still bound by the terms of the [August 2] Protective Order"

as to disclosure of protected materials. The record before

us strongly suggests that Garden Way may have been influenced

to make a higher cash offer for this settlement than would

have been made in return for a release that did not include

the provision binding the Poliquins and their attorney by the

terms of the protective order. Also, viewed in the light

most favorable to an argument that the Poliquins have a

legally protected interest at stake in this appeal, the

record fails to show that they have any tangible interest in

the outcome of this appeal (if indeed it does not strongly

suggest the contrary). Also, again viewing matters most

favorably to an argument that the Poliquins have an interest,

one may doubt that whatever intangible interest they have in

the outcome of this appeal is a legally protected interest.

The fact that the Poliquins are named as people

subject to an ongoing protective order does not demonstrate

-23-

that they have a legally protected interest in challenging

that order. To whatever extent the interlocutory protective

order survives after final judgment (dismissing the action

after the parties reported their settlement), it survives as

a "protective order" of the court -- or perhaps more

accurately stated, as protective terms of a settlement

agreement -- only because the Poliquins and their attorney

agreed to it.

The Poliquins, and the attorney who represented

them in effecting the settlement, are barred by contract from

challenging the terms of the order or the settlement

agreement incorporating those terms. I conclude also that,

by reason of this bar, the Poliquins lack the kind of

interest that would give them standing in this court (or in

the district court, see Part II below) to challenge the very

terms of the "protective order" to which they had agreed in

settling the case.

The rule that a party who settles a case cannot

thereafter appeal a court order entered previously in that

case is confirmed in precedent and is comprehensive in scope.

Any case or controversy previously existing between the

parties is moot after complete settlement. See Lake Coal Co.

v. Roberts & Schaefer Co., 474 U.S. 120 (1985) (per curiam).

Although partial settlement does not necessarily bar appeal

of unsettled disputes, see Nixon v. Fitzgerald, 457 U.S. 731,

-24-

743-44 (1982) (case not moot after agreement fixing damages

dependent on outcome of appeal), when a party enters into an

agreement encompassing a specific issue, no live case or

controversy exists over that issue. See 13A Charles A.

Wright et al., Federal Practice & Procedure 3533.2 at 234

("A partial settlement moots the issues involved in the

settlement, but not those that the parties did not intend to

settle."). One context in which appeals have been dismissed

concerns appeal of a trial court order of remittitur. Even

when a plaintiff agrees to a remittitur "under protest" and

purports to reserve a "right to appeal therefrom," the

plaintiff "may not appeal from a remittitur order he has

accepted." Donovan v. Penn Shipping Co., 429 U.S. 648, 650

(1977) (per curiam) (affirming circuit court's dismissal of

appeal).

Here, the settlement agreement purported to settle

the entire controversy, and the Poliquins specifically agreed

to abide by the terms of the protective order. Any legal

controversy between Garden Way and the Poliquins over the

propriety of the protective order, therefore, is moot.

Because the legal controversy over the protective

order was rendered moot by the settlement, we should not

decide the important issues argued before us, whether or not

the parties waived any jurisdictional impediment. See

DeFunis v. Odegaard, 416 U.S. 312, 316 (1974) (per curiam)

-25-

(determining that in federal courts, a case is not saved from

mootness by "great public interest in the continuing issues"

even if that circumstance might permit jurisdiction in a

state's legal system). Resolution of any dispute over the

protective order should be resolved under contract

principles, and not the (moot) legal controversies addressed

by the opinion of the Court in this case. See 13A Charles A.

Wright et al., Federal Practice & Procedure 3533.2 at 233-34

("[Q]uestions arising out of settlements, [as well as]

mootness questions should be answered according to the

[manifested] intent of the parties and more general contract

principles.").

B. Interest of the Poliquins' Attorney

Any interest the Poliquins' attorney may have in

challenging the terms that both the Poliquins and he agreed

to as part of the settlement cannot properly be asserted in

this appeal as an interest of the Poliquins. Indeed, any

suggestion to the contrary is troubling not only because of

its inconsistency with precedents, to be considered below,

but also because it raises a problem of potential conflict of

interest between the Poliquins and their attorney.

A party defendant may be willing to offer more

cash, and a party plaintiff may be willing to accept it, on

condition that the terms of a protective order remain in

force after the settlement. An attorney, on the other hand,

-26-

might naturally be more or less resistant to such an

agreement than the client. The potential conflict might

affect the attorney-client relationship both during

settlement negotiations and in further proceedings before the

court after the final judgment of dismissal. In post-

settlement proceedings in this case, of course, the opposing

attorneys were formally appearing not each in his own right

but each for his client or clients.

C. Real-Party-in-Interest and Constitutional Requirements

Federal Rule of Civil Procedure 17 requires that

"[e]very action shall be prosecuted in the name of the real

party in interest." Fed. R. Civ. P. 17(a). It may be

debatable whether this rule applies to proceedings in a court

of appeals. See Fed. R. Civ. P. 1 ("These rules govern the

procedure in the United States district courts ... with the

exceptions stated in Rule 81."). See also Fed. R. Civ. P. 81

(containing no specific provision regarding applicability to

proceedings in a court of appeals). Something akin to a

real-party-in-interest requirement nevertheless applies to

appeals because of the constitutional requirement of a case

or controversy. See Diamond v. Charles, 476 U.S. 54 (1986)

(appellant pediatrician did not have a judicially cognizable

interest in defending Illinois criminal statutes; only the

State did, and it did not appeal; appeal dismissed). See

also Lujan v. Defenders of Wildlife, 112 S. Ct. 2130, 2137-38

-27-

(1992) (the "injury in fact" test requires both injury to a

cognizable interest and a showing that the party seeking

review is among the injured and would be "directly" affected

by challenged action) (citations omitted).

Moreover, the Federal Rules of Appellate Procedure

contain a requirement that a "notice of appeal shall specify

the party or parties taking the appeal," Fed. R. App. P.

3(c), and this requirement has been rigorously enforced. A

court of appeals is without jurisdiction to hear an appeal on

behalf of a person who has not been specified in the notice

of appeal as a party taking the appeal. See Torres v.

Oakland Scavenger Co., 487 U.S. 312 (1988); Santos-Martinez

v. Soto-Santiago, 863 F.2d 174 (1st Cir. 1988). This court

has dismissed an appeal that an attorney sought to press to

decision after the attorney's clients had settled all

interests they had in the appeal. Pontarelli v. Stone, 978

F.2d 773 (1st Cir. 1992).

D. Conclusion

In view of the likelihood, suggested by the record,

that the only named appellants have no legally protected

interest at stake in this appeal, I conclude that we should

dismiss this appeal unless, within thirty days from this

date, a submission is filed with this court showing a factual

and legal basis for a determination that the named appellants

-28-

have a legally protected interest that would be affected by

the outcome of this appeal.

II. Jurisdiction of the District Court

In view of the rejection of my position that we

should dismiss the appeal in this case for want of appellate

jurisdiction, I turn next to considering limits upon the

district court's jurisdiction and the effect of those limits

upon the jurisdiction of this court.

Once this court determines that it has jurisdiction

of this appeal for any purpose, I do not question that the

court should at least exercise jurisdiction to consider

whether the district court erred in making an order in excess

of its jurisdiction. This court's jurisdiction may be

limited, however, to authority to vacate any aspect of the

orders of the district court that the district court lacked

jurisdiction to make.

If the district court, in either of its orders

appealed from (the December 10, 1991 and January 17, 1992

orders) made an order on the merits (for example, expanding

or narrowing the scope of the magistrate judge's August 2

order), it erred. The district court lacked jurisdiction to

enter such an order in a closed case (a final judgment of

dismissal, by reason of a settlement between the parties,

having been entered). See Part I.A, above. The district

court's error in this respect cannot confer jurisdiction on

-29-

the court of appeals to reverse in part and affirm in part,

thereby making a different order on the merits; instead, our

jurisdiction is limited to ordering that, insofar as the

district court orders appealed from purported to expand or

otherwise modify the August 2 order, they be vacated for lack

of jurisdiction of the district court to make such orders.

Just as I believe it imperative that this court be

sensitive to limits on its jurisdiction over an appeal in the

name of the Poliquins if they are no longer real parties in

interest (for reasons explained in Part I.C, above), I

believe it imperative also that this court be sensitive to

limits on the jurisdiction of the district court to act on a

motion made on behalf of the Poliquins in that court if,

before the motion was filed, the Poliquins had ceased to be

real parties in interest. The fact they are formally named

as subject to the terms of the "protective order" is not

enough to give them either a practical interest or a legally

protected interest to support their motion seeking a

modification of a "protective order" to which they agreed as

part of the settlement.

In the district court, Federal Rule of Civil

Procedure 17 was applicable without doubt. Also, the

district court was under the same constitutional constraints

as this court with respect to the jurisdictional necessity of

a live case or controversy between the parties (the

-30-

Poliquins) by whom the motion was brought and the party

(Garden Way) against which relief was sought.

A summary of the history of the protective order

includes these steps:

August 2, 1991. The magistrate judge made the

Protective Order at Garden Way's request and over the

Poliquins' opposition. The Poliquins appealed this order to

the district judge, who affirmed it as not "clearly

erroneous." An appeal to the court of appeals was dismissed

because the order was interlocutory.

October 24, 1991. During a pretrial hearing, in

response to a suggestion by plaintiff's attorney that he be

free from any restriction against disclosure of material

offered in evidence at trial, defendant's attorney disagreed

and stated, "I will request that those exhibits be returned."

The district court replied: "Correct.... When the trial is

over, whatever rights you have ... to control the further

dissemination of the material, you can invoke."

November 4, 1991. [This date is indicated in

Defendant's Memorandum in Opposition to Plaintiffs' Motion

for Determination of Confidentiality at 1 (seven days after

trial commenced on October 28, 1991).] On this date, during

trial, the parties reported to the district court that they

had settled. The court discharged the jury.

-31-

November 13, 1991. Defense counsel wrote to

plaintiffs' counsel listing 214 items claimed to be covered

by the Protective Order and requesting that the listed

material be returned or destroyed. Some of these items had

not previously been designated as confidential. This letter

appears not to have been delivered to the court at that time,

but apparently it was brought to the court's attention

through the Poliquins' motion of November 25, 1991.

November 18, 1991. The Poliquins executed a

"release and indemnity agreement" and received a check. The

agreement stated that "[r]eleasors and their attorney

acknowledge that they are still bound by the terms of the

Protective Order" as to disclosure of protected materials.

In an addendum, plaintiffs' attorney signed an

acknowledgement that the agreement was binding on him.

November 25, 1991. Two days before entry of the

final judgment of dismissal and seven days after executing

the "release and indemnity agreement," the Poliquins filed a

motion "for determination of confidentiality".

November 27, 1991. The clerk entered a final

judgment of dismissal of the action. That final judgment

made no reference to the terms of the protective order,

either in its August 2nd form or as it may have been

interpreted or modified by the district court's oral ruling

in the pretrial hearing of October 24, 1991.

-32-

December 5, 1991. Defense counsel sent to

plaintiffs' counsel and the court a letter, later treated by

the court as defendant's Motion to Seal Documentation from

its File Until Parties Come to An Agreement.

December 9, 1991. Defendant filed a written

memorandum in opposition to the Poliquins' motion of November

25.

December 10, 1991. The clerk sent the following

notice to all counsel:

Please take notice that Chief Judge Gene
Carter has this date made the following
endorsements on the motions listed below:

(1) Plaintiffs' Motion for Determination

of Confidentiality: "12/10/91 MOTION

DENIED".

(2) Defendant's Motion to Seal

Documentation from its File until Parties

Come to An Agreement (Letter addressed to

William Brownell dated December 5, 1991
from Roy E. Thompson): "12/10/91 MOTION
GRANTED; Counsel to file a proposed final
order within ten (10) days".

Addendum to Appellants' Brief at 1.

January 17, 1992. The court signed and the clerk

entered an "Order on Defendant's Motion to Seal

Documentation" as follows:

After reviewing Garden Way
Incorporated's request to seal all
confidential information contained in the
Court's file, it is hereby ordered that
all such documentation may be removed
from the Court's file by counsel for
Garden Way Incorporated. The
documentation which is to be removed is

-33-

subject to this Court's Protective Order
dated August 2, 1991. In addition the
Court will seal all testimony and
arguments made during the trial dealing
with matters which are subject to said
Protective Order, and any sealed material
shall not be reviewed except upon order
of this Court.

Id. at 2.

The Poliquins filed notices of appeal from the

December 10, 1991 and January 17, 1992 orders.

It is true that Garden Way's Memorandum in

Opposition to Plaintiffs' Motion for Determination of

Confidentiality does not argue that the district court lacks

jurisdiction to grant plaintiffs' motion. Instead, it argues

that the district court should deny plaintiffs' motion

because, after the litigation has

been settled, the case dismissed and
Plaintiffs paid, Plaintiffs' counsel
seeks an order from this Court
essentially reversing the Protective
Order, thereby permitting counsel for the
Plaintiffs to disseminate this protected
information on a nationwide basis.

Defendant's Memorandum in Opposition to Plaintiffs' Motion

for Determination of Confidentiality, 12/9/91, quoted in

Addendum to Reply Brief of Appellants, at 17.

It is true also that defendant's counsel, too,

after the settlement, in effect sought a modification of the

protective order. First, the letter of November 13, 1991,

addressed to plaintiffs' counsel, listed 214 items claimed to

be covered by the protective order and requested that the

-34-

listed material be returned or destroyed. The record does

not disclose that this request was made to the court, but

apparently it was brought to the court's attention by

plaintiffs' motion of November 25, 1991. In any event, a

second request was made by letter of December 5, which the

court treated as a motion to seal.

Even if the separate requests to the court by all

parties were treated as a manifestation of their consent to

the court's exercise of jurisdiction to consider

modifications of the protective order, such a joint request

made after the court had entered a final judgment of

dismissal cannot confer jurisdiction on a United States

district court contrary to the limitations imposed by the

Constitution and laws of the United States.

This point is reinforced by the comment of this

court when dismissing the appeal from the interlocutory

protective order in this case:

The fact that the parties may settle the
litigation and thereby foreclose
appellate review does not make an
interlocutory order immediately
appealable.

Id. at 17, quoting the ORDER OF COURT entered October 18,

1991.

In view of this history of the protective order and

the incorporation into the settlement agreement of some or

all of the terms of the protective order as they existed at

-35-

the moment of execution of the settlement agreement, the

record before us lacks complete clarity about the extent to

which protective terms survive as an order of the district

court, even though not incorporated into the final judgment,

or only as terms of the settlement agreement between the

partes, or (perhaps by analogy to a consent decree) in some

combination of court order and agreement of the parties.

For present purposes, nevertheless, I assume that

the district court is not precluded from considering and

ruling upon any motion for enforcement of the settlement

agreement. Also, incident to such a motion, the district

court may consider any request for interpretation of the

agreement and -- should grounds be shown for doing so,

consistently with the law applicable to interpretation and

enforcement of contracts -- may receive evidence to resolve

any ambiguity in the settlement agreement.

The motions before the court in this case, however,

as well as the orders of December 10, 1991 and January 17,

1992, were focused on proposed modifications of the court's

protective order as an order of the court continuing in

effect beyond the execution of the settlement and dismissal

of the case. The motions were not viewed by the parties,

their attorneys, or the court as motions seeking

interpretation and enforcement of the settlement agreement.

In these circumstances, even if we have jurisdiction to treat

-36-

the motions in the district court as if they were motions to

enforce (and interpret) the settlement agreement, and to

treat the appeal from the district court's orders as properly

before us for consideration on the merits to this limited

extent, the more prudent course is not to do so. Neither the

attorneys nor the district court viewed the matter as a

proceeding to enforce the settlement. Nor has the matter

been argued before us from this perspective. The better

course is to allow the contentions of the parties, and any

evidence relevant to their contentions, to be developed first

before the district court.

In any event, exercising jurisdiction over motions

to modify the protective order of August 2, 1991 is a very

different matter from exercising jurisdiction to enforce a

settlement agreement. If the appeal now before us is not to

be dismissed for want of jurisdiction, I conclude that we

should (a) vacate the district court's orders of December 10,

1991 and January 17, 1992 insofar as they purport to modify

and continue in force, as modified, the protective order of

August 2, 1992, and (b) remand with directions that the

district court decline to exercise jurisdiction over any

further motion by any of the parties to the settlement

agreement, or their attorneys, seeking a substantive

modification of the protective order to which they agreed as

part of their settlement.

-37-